735 P.2d 125

**TRUS JOIST CORPORATION, and American Bankers Insurance Company of Florida, individually and as assignee of Trus Joist Corporation, Plaintiffs Counterdefendants-Appellees, Cross-Appellants,**

v.

**SAFECO INSURANCE COMPANY OF AMERICA, Defendant Counterclaimant-Appellant, Cross-Appellee.**

No. 1 CA–CIV 7367.

Court of Appeals of Arizona,
Division 1, Department D.

Sept. 30, 1986.

Reconsideration Denied Jan. 15, 1987.

Review Denied April 1, 1987.

Jennings, Strouss & Salmon by M. Byron Lewis, Stephen A. Myers, Kevin J. Worthen, Phoenix, for plaintiffs counterdefendants-appellees, cross-appellants.

Kunz & Waugh, Ltd. by Donald R. Kunz, Phoenix, for defendant counterclaimant-appellant, cross-appellee.

BROOKS, Judge.

This case involves several appeals and cross appeals from three separate judgments arising from appellees, cross-appellants' (plaintiffs') suit for breach of an insurance contract and bad faith. To say that the facts and procedural history are unique and somewhat complex would be an understatement.

## FACTS

Trus Joist Corporation (Trus Joist), appellee, cross-appellant, is a Nevada corporation that designs and manufactures building trusses which are the structural supports that hold up the roofs and floors of buildings. As part of its comprehensive liability protection plan, Trus Joist carried the following liability insurance coverage:

1) a primary policy for $250,000 with Safeco Insurance Company of America (Safeco), appellant, cross-appellee;

2) a $1,000,000 umbrella policy providing excess coverage from American Bankers Insurance Company of Florida (American Bankers), appellee, cross-appellant.

The Safeco policy provided very comprehensive coverage to Trus Joist for a variety

of potential losses. In return for such protection, Trus Joist paid an extraordinarily high annual premium of $62,500.

Sometime in 1975, Trus Joist was hired by a local general contractor to design and manufacture trusses for a new automobile showroom being built for Chapman Chevrolet in Tempe. Chapman was in the business of selling new and used cars and desired to move its location from Chandler to a much larger facility.

Trus Joist had its nonengineer employees design the required trusses for the planned showroom. The design and specifications for these trusses were subsequently approved by a licensed engineer, Fred Miller. Trus Joist then sent the plans and specifications for the trusses, along with the material for building the trusses, to the general contractor for installation. After reviewing the plans and specifications for the trusses, the general contractor contacted Trus Joist several times about what it perceived to be an error in the trusses' design.[1] Trus Joist responded each time by informing the general contractor that this was a new type of truss and that there would be no problems. The trusses were thereafter installed and a new roof constructed over them.

On August 18, 1976, several of the trusses failed due to a clear design defect, causing a major portion of the unfinished showroom's roof to collapse. No personal injuries resulted from this "falldown," as it is termed in the industry, but extensive physical damage was done to the building site. Trus Joist immediately contacted Safeco about the falldown since the general contractor, roofing subcontractor, and Chapman Chevrolet were all holding Trus Joist responsible for their damages.

Safeco began an immediate investigation. By the end of August, it had gathered sufficient information to permit it to estimate that the damages from the falldown would probably exceed Safeco's $250,000 policy limit. However, the company desired further investigation into the cause of the falldown and the nature of the claimed damages.

By early September, 1976, Trus Joist had notified Safeco of its belief that it was clearly responsible for the falldown and that it wanted a quick settlement of the claims against it in order to avoid a costly law suit which could harm the company's reputation. Safeco informed Trus Joist that its investigation was not yet complete and that it was in no position to settle any of the claims.

On September 28, 1976, in an effort to speed Safeco's investigation along in the hope of obtaining a quick settlement, Trus Joist sent Safeco an itemized list of the damages claimed against it. These damages exceeded $300,000. Safeco still refused to consider settling the claims, saying that its investigation was not yet complete.

Because of Safeco's unwillingness to discuss settlement, the claimants threatened to bring suit against Trus Joist for the damages arising from the falldown. They agreed, however, to meet with Trus Joist on October 14, 1976, in a final attempt to settle. Prior to this meeting, Trus Joist contacted Safeco about the possibility of allowing Trus Joist to settle with the claimants on its own without waiving any of its rights to reimbursement from Safeco for monies due under the policy.[2] Safeco agreed on the condition that Trus Joist consent to a reduction of the policy limits from $250,000 to $230,000 and that it further agree that any dispute as to the amount of reimbursement due under the policy would render the *entire* amount subject to arbitration upon demand by either party. A written contract incorporating these modifications to the insurance policy was signed on October 11, 1976.

On October 14, 1976, Trus Joist met with the claimants. Representatives from both Safeco and American Bankers were

---

[1]. The defect in the design of the trusses was that no provision for bottom chord bracing was made in the plans. Bottom chord bracing prevents the truss from twisting when heavy weight is applied to it.

[2]. Under the terms of the insurance policy, Trus Joist was precluded from settling any claims without Safeco's consent.

present. However, Safeco's representative refused to participate in the settlement negotiations, stating that he was present only as an "observer." Because the claimants were demanding more than $250,000 in damages, Trus Joist refused to settle on its own and prepared to walk away from the negotiations. American Bankers, realizing that litigation would drive up costs and that it would be liable as the excess carrier for any award against Trus Joist over Safeco's policy limits, urged settlement. To this end, it agreed to pay $250,000 to settle the claims against Trus Joist and to release it from any liability in return for an assignment of Trus Joist's right to reimbursement from Safeco under the October 11 agreement. Trus Joist agreed and the third party claims were settled for $256,000. Of this amount, American Bankers paid $253,000 and Trus Joist $3,000.

Subsequently, Safeco appraised the prior claimants' damages and offered Trus Joist $195,000 as reimbursement under the October 11 agreement.[3] Trus Joist rejected this offer and on December 28, 1976, demanded arbitration. Arbitration was pending for approximately a year and a half without a hearing. Trus Joist eventually filed suit against Safeco on April 4, 1978, claiming breach of the insurance contract and bad faith.[4] American Bankers subsequently joined in this action as a plaintiff.

During discovery, Safeco learned that Fred Miller, the engineer who approved the truss plans and specifications, was not an employee of Trus Joist, but was an independent consultant. As a result, Safeco claimed that it owed no coverage to Trus Joist under exclusion (h) of the policy, which reads:

This insurance does not apply:

\* \* \* \* \* \*

(h) to *contractual liability* assumed by the *insured,* if the *insured* or his indemnitee is an architect, engineer or surveyor, for ... *property damage* arising out of the rendering of or the failure to render professional services by such *insured* or indemnitee, including.

1) the preparation or approval of ... designs or specifications....

(Emphasis in original.) Trus Joist responded by pointing out that Safeco had specifically conceded coverage for the falldown in the October 11, 1976 agreement and was therefore barred from raising any coverage issues. Safeco consequently filed a counterclaim seeking rescission of the October 11 agreement due to Trus Joist's alleged fraudulent misrepresentation as to Fred Miller's employment status with Trus Joist.

The trial court divided the proceeding into three separate trials or "phases," each dealing with a specific aspect of the case. Phase I dealt solely with the issue of whether exclusion (h) of Safeco's policy precluded coverage for Trus Joist. The court granted summary judgment to Trus Joist on this issue, holding that coverage did exist.

Phase II dealt solely with the issue of Safeco's requested rescission of the October 11 agreement between Trus Joist and Safeco. Trus Joist agreed to Safeco's requested rescission. The court therefore found no triable issue and entered summary judgment granting rescission.

Phase III consisted of a jury trial on the breach of contract and bad faith claims. After trial, the jury returned a single verdict against Safeco for $267,434 in compensatory damages for breach of contract and bad faith and $10,000,000 in punitive damages. Safeco subsequently filed a timely motion for a new trial which was granted on the grounds that the trial court gave improper instructions to the jury on the bad faith claim. The trial court vacated the jury's award but entered a judgment on behalf of Trus Joist and American Bankers for $250,000, with prejudgment interest, on the breach of contract claim. The court ordered a new trial on the bad faith claim and awarded the plaintiffs attorney's fees in the sum of $103,499.

---

3. Among other things, Safeco disputed a $55,000 cost item for the installation of a tile floor.

4. Arbitration was stayed by an order of the trial court and was eventually dispensed with upon the rescission of the October 11, 1976 agreement which will be discussed later in this opinion.

All parties now appeal raising numerous issues regarding all three phases of the proceeding in the trial court. Because of the breadth of the issues and the interplay that they have with one another, we will address the issues as they relate to the trial court's rulings as follows:

1) the summary judgment granted to Trus Joist and American Bankers on the issue of whether Trus Joist had coverage under the Safeco policy;

2) the order granting rescission of the October 11, 1976 agreement;

3) the order granting a new trial on the issue of bad faith;

4) the entry of a judgment in favor of Trus Joist and American Bankers on the breach of contract claim.

While such a discussion will not treat the issues in the order in which they are raised in the appeal and cross-appeal, the complexity of this case mandates such an approach.

## I

## THE SUMMARY JUDGMENT ON THE COVERAGE ISSUE

Safeco argues that the trial court erred in granting summary judgment to Trus Joist and American Bankers on the question of whether exclusion (h) of the Safeco policy precluded coverage in this case. We disagree and affirm the trial court's grant of summary judgment.

The basis of the trial court's summary judgment was that even if all the facts were decided in Safeco's favor:

The Safeco policy would still cover Trus Joist as to any liability it may have for the falldown, except "contractually assumed liability" (if any) as defined in Exclusion (h); *and* that even if Trus Joist did contractually assume the liability of Fred Miller, and even if Miller's negligence was superseding and intervening and the sole cause of the falldown, and even if the roof system could not have been erected without Miller, Trus Joist could *still be liable*, at the same time, for other reasons such as vicarious liability for the negligence of Fred Miller, products liability, completed operations liability, breach of contract,

and breach of warranties of fitness and merchantability.

(Emphasis in original.)

Safeco argues that the trial court's grant of summary judgment was in error because if Fred Miller was the sole proximate cause of the falldown, Trus Joist could not be held *independently* liable for the resulting damages. It argues that any exposure to liability that Trus Joist could suffer as a result of Miller's professional negligence would arise wholly from Trus Joist's agreement to indemnify Miller for any claims brought against *him*. Such contractual liability on Trus Joist's part is clearly excluded from coverage under Safeco's policy by exclusion (h).

To begin, it is clear that exclusion (h) applies only to "contractual liability" or "liability expressly assumed under a contract or agreement" by Trus Joist with a third party. The obvious purpose of such an exclusion is to prevent the insured from increasing Safeco's exposure by contractually bringing third parties under the comprehensive protection afforded to the insured by the Safeco policy. In the instant case, the exclusion operates to prevent Fred Miller, a stranger to the insurance contract, from enjoying any protection under the policy solely by virtue of his having an indemnity contract with Safeco's insured, Trus Joist. If Trus Joist wishes to indemnify Fred Miller, it must do so on its own and may not look to Safeco for protection. This is a valid purpose: Safeco has the right to choose its own insureds. However, the exclusion and the purpose it seeks to vindicate are not applicable here. In this case, Trus Joist is not seeking to bring a third party under the protection of Safeco's policy. Rather, Trus Joist is seeking protection against its *own independent liability*. The claimants in this case were not seeking damages from Fred Miller, who then looked to Trus Joist for payment, but were seeking recovery directly from Trus Joist and holding it responsible on its own account for any damages arising from the falldown. Since contractual liability for a third party's negligence is not at issue

here, the exclusion does not apply and Trus Joist has coverage under the policy.

Safeco contends, however, that if Fred Miller's professional negligence was the sole proximate cause of the falldown, Trus Joist could not have been held independently liable, since where one party is the sole cause of an injury, no other may be held liable. In making such an assertion, Safeco ignores the large body of law that imposes legal liability upon one party for the negligent acts of another. In granting summary judgment to the plaintiffs, the trial court held that even if Fred Miller's negligence was the sole cause of the falldown, Trus Joist could still be independently liable on any one of several theories, among them: vicarious liability, products liability, breach of contract, and breach of warranties. Under each of these theories, the trial court found that the claimants could have looked directly to Trus Joist for recovery and could have held it personally liable.

■ Without deciding whether the trial court was correct in applying the other theories listed above to this case, we note that Trus Joist could clearly be held liable for the falldown under a products liability claim. Such liability may be imposed on the manufacturer or seller of a defectively designed product which subsequently causes injury to a purchaser or user of that product. *O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 447 P.2d 248 (1968); *Sullivan v. Green Mfg. Co.*, 118 Ariz. 181, 575 P.2d 811 (App.1977). Strict liability in tort views the defect from the consumer's standpoint and focuses on whether the defect makes the product unreasonably dangerous. *Jones v. Pak-Mor Mfg. Co.*, 145 Ariz. 132, 700 P.2d 830 (App.1984), *affirmed in part*, 145 Ariz. 121, 700 P.2d 819 (1985); *see also, Hohlenkamp v. Rheem Mfg. Co.*, 134 Ariz. 208, 655 P.2d 32 (App.1982). Where liability is sought to be imposed under strict tort liability, fault on the part of the defendant is not an issue. *Salt River Project Agri-*

*cultural Improvement & Power District v. Westinghouse Electric Corp.*, 143 Ariz. 368, 694 P.2d 198 (1984); *Brady v. Melody Homes Mfg.*, 121 Ariz. 253, 589 P.2d 896 (App.1978). We find that, as a matter of law, Trus Joist could have been found independently liable on a strict products liability theory even if Fred Miller's professional negligence was the sole cause of the falldown. It is undisputed that Trus Joist defectively designed the truss; that this defect made the truss unreasonably dangerous; that Trus Joist then had the truss design negligently approved by Fred Miller; that Trus Joist adopted this approval as its own; and that Trus Joist then sold the defectively designed trusses to a purchaser who was subsequently injured by them. There is thus no question that Trus Joist could have faced personal and independent liability for damages arising from the trusses' failure irrespective of Miller's negligence or the fact that an indemnity agreement existed between Miller and Trus Joist.[5] As such, it had the right to look to Safeco for protection under the policy. The trial court thus properly granted summary judgment to the plaintiffs on the issue of whether coverage existed under the policy.

## II

### THE ORDER GRANTING RESCISSION

Safeco argues that the trial court erred when it ordered a rescission of the October 11, 1976 agreement between Safeco and Trus Joist. The crux of Safeco's argument is that by summarily granting Safeco its requested relief, the trial court precluded Safeco from proving that the rescinded agreement was fraudulently obtained and that Trus Joist was therefore guilty of non-cooperation. Safeco contends that such a finding would have given rise to a defense against enforcement of the insurance policy, allowing Safeco to escape liability under the breach of contract and bad faith claims filed against it. We find such

---

**5.** In *Salt River Project,* our supreme court held that where economic loss is accompanied by physical damage to property other than the defective product itself, strict tort liability may be applied and the plaintiff will be able to recover all damages generally recoverable in tort actions.

an argument meritless and affirm the trial court's order rescinding the October 11, 1976 agreement.

The record shows that Safeco filed a counterclaim against the plaintiffs seeking rescission of the October 11 agreement on the grounds that it was obtained through Trus Joist's fraudulent misrepresentations as to Fred Miller's employment with Trus Joist. In its answer, and again by motion, Trus Joist agreed to Safeco's requested rescission. The trial court therefore found that no triable issue existed with regard to the question of rescinding the agreement. It consequently informed the parties that it would either: 1) grant rescission on the grounds that Safeco accepted it, or, if Safeco did not accept, because no triable issue existed; or, 2) strike that portion of Safeco's counterclaim requesting rescission on the ground that the requested relief had been tendered and refused. Safeco was given the option to choose which result it wanted and chose to rescind the agreement.

In ruling as it did, the trial court took note of Safeco's trial tactics and its desire to have the fraud issue litigated. However, the court felt that it would be "unfair and prejudicial" for Safeco to present the fraud issue to the jury under the guise of seeking rescission when its real purpose was to surreptitiously establish a defense against liability in a different phase of the proceedings. The court ruled, therefore, that if Safeco wished to present such a defense, it would have to do so in a straightforward manner. The court subsequently fashioned the order granting rescission expressly so as not to prejudice Safeco's right to raise and prove fraud on Trus Joist's part in a later phase of the litigation as a defense to the plaintiffs' breach of contract and bad faith claims. The trial court then found that both parties had stipulated that, despite the rescission, those provisions of the October 11, 1976 agreement allowing Trus Joist to settle with the third-party claimants and to seek reimbursement from Safeco remained in effect.[6]

We find no merit in Safeco's claim that the trial court acted improperly in granting the rescission. Equally meritless is the assertion, implicit in Safeco's argument, that it has the right to litigate a matter solely for an academic resolution of the legal points involved despite the fact that the underlying issue in the case has been resolved. There is no such right and the courts of this jurisdiction will generally not render such advisory opinions. *Contempo-Tempe Mobile Home Owner's Ass'n. v. Steinert,* 144 Ariz. 227, 696 P.2d 1376 (App.1985); *Ash, Inc. v. Mesa Unified School Dist.,* 138 Ariz. 190, 673 P.2d 934 (App.1983).

Moreover, Safeco's argument that it was harmed by obtaining the very relief it was seeking is also without merit. It is the general rule that a party has no right to appeal from a judgment in its favor since it cannot be an aggrieved party. *Britz v. Britz,* 95 Ariz. 247, 389 P.2d 123 (1964). This rule applies even though the judgment or holding in favor of the party is clearly erroneous. *Id.; Chambers v. United Farm Worker's Organizing Committee,* 25 Ariz.App. 104, 541 P.2d 567 (1975). While an exception to the rule may exist where, as in *Chambers,* an adverse finding to the prevailing party is made part of the judgment and is likely to have a future detrimental effect on that party's rights, no such finding was made in this case. Indeed, the trial court carefully preserved Safeco's right to raise the issue of fraud at a later stage of the proceedings. Therefore, Safeco is barred from complaining on appeal with reference to the trial court's judgment granting rescission of the October 11, 1976 agreement. The fact that such a result may have had an adverse impact on Safeco's convoluted trial strategy is not the type of injury for which the appellate courts of this state will give redress.

---

**6.** We note that both parties have ignored this stipulation in their arguments on appeal, a fact that has led to some confusing inconsistencies in the briefs.

## III

### THE ORDER GRANTING A NEW TRIAL ON THE BAD FAITH CLAIM

From the record, it is evident that both the plaintiffs and the trial court initially viewed plaintiffs' bad faith claim as one for "third-party bad faith" arising from Safeco's failure to settle with the third-party claimants.[7] The trial court therefore instructed the jury solely on the "equal consideration" test established in *Farmers Ins. Exch. v. Henderson*, 82 Ariz. 335, 313 P.2d 404 (1957), for determining whether an insurance company is guilty of bad faith in failing to settle third-party claims against its insured. Under this test, where an insurer fails to give equal consideration to its insured's interests by placing its own interests before those of its insured, it is guilty of bad faith. *Id.* at 338–39, 313 P.2d at 405–406. The jury subsequently returned a single verdict against Safeco awarding damages for breach of contract and bad faith. However, after the jury's verdict was returned, the trial judge concluded that he had erred in instructing the jury on the bad faith issues. He reasoned that while he gave a proper instruction for third-party bad faith, the plaintiffs' claims against Safeco were effectively converted into first-party claims once Trus Joist and American Bankers had settled directly with the third-party claimants on October 14, 1976. He concluded that the "equal consideration" test used in third-party cases provided a different legal standard than the "fairly debatable" test for first-party bad faith which was articulated by our supreme court in *Noble v. National American Life Ins. Co.*, 128 Ariz. 188, 624 P.2d 866 (1981).[8] The trial judge therefore ordered a new trial on the issue of bad faith. Additionally, he vacated the jury's $10,000,000 punitive damage award against Safeco finding it to be clearly excessive.

Plaintiffs argue in their cross-appeal that the trial judge erred in granting a new trial on bad faith and in vacating the punitive damage award. They first argue that *Borland v. Safeco Ins. Co. of America*, 147 Ariz. 195, 709 P.2d 552 (App.1985), establishes a *per se* rule of bad faith where an insurer delays payment to its insured. In *Borland*, we stated:

> *Where coverage is not contested* but the amount of the loss is disputed, the insurer is under a duty to pay any undisputed portion of the claim promptly. Failure to do so amounts to bad faith.

*Id.* at 200, 709 P.2d at 557 (emphasis added).

We find that this language from *Borland* is inapplicable here. First, coverage in this case was ultimately contested. Further, there was at one time an express agreement between Trus Joist and Safeco that if any dispute arose as to the amount of reimbursement owed by Safeco to Trus Joist, the entire amount would be subject to arbitration. Moreover, to read *Borland* as creating a rule of strict liability for bad faith in delaying payment misinterprets *Borland* and inflates its holding. Such an interpretation is contrary to the well-established rule that the tort of bad faith is based, in part, on the reasonableness of the insurer's conduct under the circumstances. *See, e.g., Sparks v. Republic Nat. Life Ins. Co.*, 132 Ariz. 529, 647 P.2d 1127 (1982), *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982); *Noble*, 128 Ariz. 188, 624 P.2d 866. Whether Safeco acted reasonably under the unique facts of this case was a question for the jury.

Plaintiffs next argue that the trial court erred when it found a distinction between the "equal consideration" test for third-party bad faith and the "fairly debatable" test for first-party actions. They argue that there is a single duty of good faith and that "reasonableness under the circumstances" is the overall standard against which an insurance company's conduct is measured, whether in relation to settling third-party

---

7. Claims brought directly against an insurer by its own insured are commonly referred to as "first-party" claims, while those brought against the insured by a third person are called "third-party" claims.

8. In *Noble*, the court held that an insurer may challenge claims by its insured which are "fairly debatable" without fear of facing liability for bad faith in refusing to pay.

claims against its insured or paying its own insured's claims. They contend that since both the "equal consideration" and "fairly debatable" tests focus on the same standard of care—"reasonableness under the circumstances"—they are interchangeable means of stating the law of bad faith. They assert, therefore, that the trial court's instructions on the "equal consideration" test properly apprised the jury of the law of both first and third-party bad faith.

We begin our analysis by agreeing that there is but one overall standard of good faith in an insurance company's dealings with its insured. In *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973), the California Supreme Court held that an insurer's duty not unreasonably to withhold payments due under the policy in first-party claim situations is just another aspect of the same duty of good faith that requires insurers to accept reasonable offers to settle in third-party situations. *Id.* at 485, 510 P.2d at 1037. Arizona adopted the *Gruenberg* rationale in *Noble*, 128 Ariz. 188, 624 P.2d 866. In *Noble*, our supreme court held that the tort of bad faith applied equally to cases involving an insurer's refusal to pay first-party claims by its own insured and to cases involving an insurer's failure to settle third-party claims against its insured. In reaching this conclusion, our supreme court relied upon the following language from *Gruenberg*:

> It is manifest that a common legal principle underlies all of the foregoing decisions; namely, that in every insurance contract there is an implied covenant of good faith and fair dealing. The duty to so act is imminent in the contract whether the company is attending to the claims of third persons against the insured or the claims of the insured itself. . . .

128 Ariz. at 189, 624 P.2d at 867.

Similarly, in *Brown v. Superior Court*, 137 Ariz. 327, 670 P.2d 725 (1983), our supreme court again indicated that there is no true distinction between first and third-party bad faith insofar as the applicable standard of conduct required. There, the court stated:

> The tort of bad faith arises when an insurance company intentionally denies, fails to process, or fails to pay a claim without a reasonable basis for such action. *Sparks v. Republic National Life Ins. Co.*, 132 Ariz. 529, 538, 647 P.2d 1127, 1136 (1982) [first-party bad faith case]; *Noble v. National American Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981) [first-party bad faith case]; *Farmers Ins. Exchange v. Henderson*, 82 Ariz. 335, 338–339, 313 P.2d 404, 406 (1957) [third-party bad faith case]. No matter how the test is defined, bad faith is a question of reasonableness under the circumstances.

137 Ariz. at 336, 670 P.2d at 734.

Finally, in the recent Arizona Supreme Court case of *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986), the court again noted, citing both *Gruenberg* and *Noble*, that there is no real distinction between the prohibition in first-party cases against challenging an insured's claim unless it is fairly debatable and the obligation in third-party cases to give equal consideration to the insured's interests. *Apodaca*, 151 Ariz. at 156–57, 726 P.2d at 572–73. The court stated that the "fairly debatable" test is merely a restatement of the insurer's obligation to give equal consideration to its insured's interests. *Id.*

■ Accordingly, we find no legal distinction between the duty or standard of good faith owed by an insurance company when dealing with first-party claims and that owed by an insurer when dealing with third-party claims. Instances of first and third-party bad faith merely involve different breaches of the same overall duty of good faith.

We disagree, however, with plaintiffs' assertion that mere reasonableness is the sole standard for establishing bad faith or that an insurer's unreasonable conduct alone is sufficient to establish liability. For if, as plaintiffs argue, reasonableness under the circumstances is the sole standard for bad faith, the tort would simply be equivalent to a negligence action. Yet it

has long been established in Arizona that negligence alone is insufficient to impose liability on an insurer for the tort of bad faith. *See Apodaca,* 151 Ariz. at 157, 726 P.2d at 573; *Farmers Ins. Exch.,* 82 Ariz. 335, 313 P.2d 404; *Fulton v. Woodford,* 26 Ariz.App. 17, 21, 545 P.2d 979, 983 (1976). On the other hand, while the tort of bad faith is often referred to as an "intentional" tort, it is clear that a bad faith claim does not rise to the level of a traditional intentional tort in the sense that the insurer must know with substantial certainty that its actions will bring particular harm to its insured. *See Restatement (Second) of Torts* § 8A, comment B (1965). Rather, the courts' references to the "intentional" aspect of the tort of bad faith have been largely limited to the insurer's "conscious conduct"—as opposed to mere mistake or oversight—rather than to a knowledge of impending harm to its insured. Thus, in *Apodaca,* our supreme court stated:

> The "intent" required [to establish a bad faith claim] is an "evil hand"—the intent to do the act. *Mere negligence or inadvertence is not sufficient*—the insurer must intend the act or omission and must form that intent without reasonable or fairly debatable grounds. But an "evil mind" is not required; the insurer need not intend to harm the insured....

151 Ariz. at 160, 726 P.2d 576 (emphasis added).

The tort of bad faith thus appears to be a hybrid, sharing elements of both a negligence action and one for an intentional tort. Arizona's case law supports this view. In *Noble,* our supreme court, citing *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 271 N.W.2d 368 (1978), set out the elements for the tort of bad faith as follows:

> To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy *and* the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.

128 Ariz. at 190, 624 P.2d at 868 (emphasis added). The same elements of the tort were also enunciated in *Farr v. Trans-*

*america Life Ins. Co.,* 145 Ariz. 1, 5, 699 P.2d 376, 380 (App.1984), where this court stated:

> While the tort of bad faith is often referred to as an intentional one, the cause of action is established if the plaintiff demonstrates that the defendant had knowledge of or recklessly disregarded the lack of a reasonable basis for denying the claim.

From these cases, it is apparent that there are two elements to the tort of bad faith:

> 1) that the insurer acted unreasonably toward its insured, *and*
>
> 2) that the insurer acted *knowing* that it was acting unreasonably *or* acted with such reckless disregard that such knowledge may be imputed to it.

The first element is clearly an objective test based upon a simple negligence standard: did the insurance company act in a manner consistent with the way a reasonable insurer would be expected to act under the circumstances. This is the threshold test for all bad faith actions, whether first or third-party. Where an insurer acts reasonably, there can be no bad faith. However, the converse of this proposition is not necessarily true: merely because an insurer acts unreasonably does not mean that it is guilty of bad faith. Negligent conduct which results solely from honest mistake, oversight, or carelessness does not necessarily create bad faith liability even though it may be objectively unreasonable. *See Apodaca,* 151 Ariz. at 161, 726 P.2d at 577. Some form of consciously unreasonable conduct is required. This requirement of consciously unreasonable conduct is fulfilled either by the insurer's knowledge that it is acting improperly *or* by reckless conduct which permits such knowledge to be imputed to it. It is this second, subjective, element of knowledge that elevates bad faith to a quasi-intentional tort.

Both the "equal consideration" and "fairly debatable" tests at issue here encompass the above elements, each being merely a shorthand method for applying the law of bad faith to different breaches of the overall duty of good faith.

We now turn to the jury instructions on bad faith which were submitted to the jury in this case. In doing so, we note that they were almost exclusively drawn with reference to Safeco's alleged bad faith in failing to settle directly with the third-party claimants. In that regard, the trial court's primary instruction on the "equal consideration" test read as follows:

The contract of insurance obligates the insurer to make such investigation and *settlement of claims against its insured* as it deems expedient. In this regard, the law considers that the *duty to settle* is recognized for the benefit of the insured, not the injured claimant.

In making any determination *as to settlement,* the insurer must give equal consideration to the rights of its insured with respect to protection from burdens, expenses and embarrassments from litigation as well as protection against excess liability above the policy limits, as it gives to its own economic interests. This means that the insurer must not be moved by partiality to itself or its own interests and at the same time it need not give the interests of the insured any preferential consideration.

If under the facts of this case, you find that good faith on the part of Safeco would have obligated it to *resolve the claims against Trus Joist by settlement,* its failure to do so renders it liable as between the insured and the insurer for the reasonable amount of the damages of the claimants paid by Trus Joist and American Bankers to effectuate complete releases of all claims from the damaged parties.

(Emphasis added.) A follow-up instruction read:

Factors that you may take into consideration in applying the "equality of consideration" doctrine include:

1. The strength of the damaged claimant's cases on issues of liability and damages;

2. Attempts by the insurer, directly or indirectly, to induce the insured to *contribute to a settlement;*

3. Failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured;

4. The amount of financial risk to which each party is exposed in the event of a *refusal to settle;*

5. The fault, if any, of the insured in inducing the insurer's rejection of an *opportunity to settle* by misleading it as to the facts; or

6. Any other factors tending to establish or negate bad faith on the part of the insurer.

(Emphasis added.)

While these instructions set forth the "equal consideration" test for determining if Safeco breached its duty of good faith by failing to settle directly with the third-party claimants, they do not apprise the jury of the applicable law on whether Safeco breached its duty of good faith by failing to reimburse Trus Joist following Trus Joist's settlement of those claims.

Plaintiffs counter, however, by arguing that even if the trial court's instructions were insufficient with respect to a first-party situation, the error is harmless since the jury was properly instructed on third-party bad faith and, in fact, found Safeco liable under that theory. We disagree.

To begin, it is not clear that the jury in fact found that Safeco was guilty of bad faith in failing to settle with the third-party claimants. The jury simply found "bad faith." They may well have based their finding in whole or in large measure upon Safeco's failure to reimburse Trus Joist, rather than Safeco's failure to settle, *despite the fact that no appropriate instructions were given.*[9] Throughout the

9. The only instruction which in any way drew the jury's attention to Safeco's possible bad faith liability for failing to reimburse Trus Joist was as follows:

Safeco's duty of good faith did not end on October 14, 1976, when the claims of Chapman, Ryan, and Farnsworth were settled and releases were signed by the damaged claimants. The duty of good faith continued by virtue of Safeco's obligations to make a determination of how much, if any, it should reim-

presentation of their case, plaintiffs placed great weight on Safeco's refusal to reimburse Trus Joist under the October 11, 1976 agreement as a basis for their bad faith claim. Appellees' position on Safeco's failure to pay is best summed up by the following passage from their closing argument to the jury:

Judge Roberts will tell you in his instructions that Safeco's duty of good faith did not end on October 14th, 1976 when the claims of Chapman, Ryan, and Farnsworth [the third-party claimants] were settled and releases were signed by the damaged claimants. *The duty of good faith continues by virtue of Safeco's obligation to make a determination of how much, if any, it should reimburse Trus Joist and American Bankers for money paid out.*

We don't come in to court faulting Safeco *for not paying us the money back* on October the 14th, if in fact they had not completed their investigation, although we do not understand why their investigation couldn't and was not completed. *But, why didn't they pay us back in November* when they had the information from Mr. Mann and Mr. Dolan? *Why didn't they pay us back in December or January of 1977, or anytime in—'77, '78, '79, 80, '81, '82?* They had the information. They had all of the information. *And they didn't pay us back. They didn't offer to pay us back.*

(Emphasis added.)

■ It is highly conceivable that the jury, far from finding Safeco liable for failing to settle the third-party claims against Trus Joist, was persuaded that Safeco was guilty of bad faith in subsequently failing to reimburse Trus Joist. Yet, the trial court refused *all* of Safeco's requested instructions patterned from the standards set forth in *Noble,* 128 Ariz. 188, 624 P.2d 866, including the "fairly debatable" test, finding the instructions to be "inapplicable." In *Sparks v. Republic National Life Ins. Co.,* in denying a motion for rehearing, our supreme court stated:

burse Trus Joist and American Bankers for

The jury instructions in this case were given before this court's decision in *Noble v. National American Life Insurance Co.,* 128 Ariz. 188, 624 P.2d 866 (1981). In the case at issue, the challenged instructions on the tort of bad faith were held not to constitute reversible error. We, however, do not approve the use of those instructions in future cases. *Our case of Noble sets out the principles which should be embodied in instructions on cases involving the tort of bad faith.*

132 Ariz. at 546, 647 P.2d at 1144 (emphasis added). It is the duty of the trial court to instruct the jury on all legal theories presented which are supported by the evidence. *Kauffman v. Schroeder,* 116 Ariz. 104, 568 P.2d 411 (1977); *Young Candy & Tobacco Co. v. Montoya,* 91 Ariz. 363, 372 P.2d 703 (1962).

■ The instructions in the instant case were simply incomplete. Accordingly, we find that the trial court's order granting a new trial on the bad faith claim was proper, and we consequently affirm it. It is therefore unnecessary to address the trial court's order vacating the award of punitive damages.

## IV

## THE JUDGMENT FOR BREACH OF CONTRACT

After judgment was entered on the jury verdict against Safeco awarding $267,434 in compensatory damages on both the breach of contract and bad faith claims, the trial court ordered that a new trial be held on the bad faith issue but entered judgment on the verdict for the sum of $250,000 on the claim for breach of contract. The court reasoned that the first $250,000 of the jury's verdict against Safeco necessarily represented the breach of contract portion of the award. It thus sought to preserve this part of the jury's verdict while at the same time ordering a new trial on bad faith. The court also ordered Safeco to pay prejudgment interest dating from December 3, 1976—the date Safeco initially

money paid out.

offered Trus Joist $195,000 to reimburse it for the monies expended by Trus Joist in settling with the third-party claimants. Safeco argues that the trial court's entry of the judgment for breach of contract constituted reversible error for the following reasons:

1. the jury's single award of $267,434 was undifferentiated and cannot be rationally divided between damages for breach of contract and damages for bad faith;

2. the jury's breach of contract award was prejudicially "tainted" by the erroneous bad faith instructions;

3. the jury's verdict was prejudiced by juror misconduct;

4. no breach of contract could have occurred since Safeco complied with the arbitration requirements of the October 11, 1976 agreement;

5. the jury's breach of contract award was based upon an improper instruction allowing the jury to consider Chapman Chevrolet's potential claim for lost profits in determining if Trus Joist acted "reasonably" in paying $250,000 to settle the claims against it;

6. the award of prejudgment interest was improper because the damages claimed by Trus Joist were unliquidated;

7. the award of attorney's fees was excessive.

Safeco bases its arguments for overturning the trial court's judgment, in part, on the nature of the trial court's proffered verdicts to the jury. The trial court gave the jury four prepared verdicts. The first was a defense verdict for Safeco. The remaining verdicts were all for Trus Joist and American Bankers. One awarded the plaintiffs compensatory damages solely for Safeco's breach of contract. Another awarded the plaintiffs compensatory damages for both breach of contract and bad faith. The last awarded compensatory damages for both breach of contract and bad faith as well as punitive damages. It

was the last of these that the jury signed and returned to the court.

Safeco correctly points out that the verdicts did not differentiate between damages for breach of contract and damages for bad faith, but rather combined them into a single lump sum award. It argues that it is therefore impossible to apportion the jury's $267,434 award between the breach of contract and bad faith claims.

■ We find Safeco's argument unpersuasive, particularly in light of its contrary argument to the trial court in support of its motion for new trial. In its memorandum in support of its motion for new trial, Safeco argued that "it is clear that the 'first' $250,000 [of the jury's $267,434 award for compensatory damages] was, *and had to be*, under the Court's jury instruction, awarded by the jury for *breach of contract*." (Emphasis in original.) Obviously, the trial court accepted Safeco's argument, which is apparently undisputed, when it granted Safeco a new trial on the issue of bad faith but entered a judgment upholding the jury's presumed $250,000 award for breach of contract.[10] We will not now permit Safeco to argue that the trial court erred in apportioning the jury's lump sum award between the breach of contract and bad faith claims on the grounds that such a division is "rationally impossible."

Safeco next argues that the trial court's judgment should be reversed because the jury's verdict was "tainted" by the erroneous bad faith instructions. Plaintiffs counter by arguing that the giving of an erroneous instruction is harmless error where the jury's decision could not have been affected by the instruction. *See Hoeffel v. Campbell*, 16 Ariz.App. 577, 494 P.2d 777 (1972); *Haines v. Southern Pacific Co.*, 7 Ariz. App. 65, 436 P.2d 159, *cert. denied*, 393 U.S. 860, 89 S.Ct. 134, 21 L.Ed.2d 127 (1968). They point out that the jury was instructed that it must first find a breach of contract before it could proceed to consider whether Safeco acted in bad faith.[11]

**10.** It also appears to be undisputed that the balance of the award of compensatory damages represented costs incurred by Trus Joist in

cleaning up the debris at the building site following the "falldown."

**11.** The instruction read as follows:

Plaintiffs argue, therefore, that even if the trial court erred in its instructions on bad faith, the error was harmless with respect to the breach of contract issue since it could not have affected the jury's conclusion that Safeco breached its contract.

■ We first note that there is no issue on appeal with respect to the sufficiency or propriety of the jury instructions on the claim for breach of contract. Further, it is clear that the jury found that Safeco had, in fact, breached its contract with Trus Joist. The trial court then concluded that the erroneous jury instructions on the bad faith issue could not have "tainted" the jury's findings on the breach of contract claim since, under the court's instructions, the jury was required to focus on the breach of contract issue before considering Safeco's alleged bad faith. The limiting of a new trial to part of the issues lies within the sound discretion of the trial court. *In re Thompson's Estate,* 1 Ariz.App. 18, 398 P.2d 926 (1965). We find no abuse of discretion.

Safeco next points out that the jury was instructed generally in terms of "breach of contract" with no distinction made between the October 11, 1976 agreement and the insurance contract itself. It argues that it is impossible to determine which contract the jury found that Safeco breached.

We agree that the trial court made no distinction between the October 11, 1976 agreement and the original insurance policy, but rather coalesced the obligations owed under both agreements into a single "bundle" of duties which it designated as. "the contract." [12] However, no jury instructions were requested which would have required that the jury differentiate between the two agreements and, as previously noted in this opinion, there is no issue on appeal with regard to the sufficiency of the trial court's instructions on breach of contract.

### Juror Misconduct

Safeco next argues that, apart from any improper jury instructions, the jury's finding of a breach of contract was prejudiced by juror misconduct which mandates a new trial on all issues. This allegation centers on the fact that during the jury's deliberations, one of the jurors looked in the yellow pages of the telephone book under the headings "architect" and "engineer" for an engineer named "Sandig" who had provided Safeco with an evaluation of the cause of the falldown. Upon finding that there was no professional listing, the juror so advised the other members of the jury and stated that Sandig was a "phoney." The trial court found that there was "no reasonable possibility that extraneous matters introduced by [the juror] could have any prejudic[ial] effect as to the first $250,000 of the compensatory damage portion of the verdict. . . ."

■ While the juror's misconduct is not to be condoned, the "extraneous information" which he brought to the jury's attention was solely the fact that Sandig did not have a business or professional listing in the telephone book. After applying the applicable legal standard, the trial court concluded that the incident did not justify the granting of a new trial. The grant or denial of a new trial is within the sound discretion of the trial court and we will not upset its rulings on appeal in the absence of a clear abuse of discretion. *Adroit Supply Co. v. Electric Mut. Liability Ins. Co.,*

---

If you find from the evidence that Safeco breached its contract with its insured, Trus Joist, then you are instructed that the plaintiffs are entitled to recover a judgment against Safeco for the amount of the reasonable sums paid to settle claims for which Trus Joist had legal liability up to the amount of the $250,-000 policy limit.

If you find that Safeco breached its contract with its insured, Trus Joist, as described above, *and if you also find that Safeco was acting in bad faith in doing so,* then you may return a verdict for an amount in excess of

the policy limit which reimburses the plaintiffs for the total amount of the reasonable sums paid to the claimants in settlement of the claims, without being limited to the $250,-000 policy limit amount. (Emphasis added.)

12. It is important to keep in mind that the October 11, 1976 agreement was actually rescinded by the time the jury began its deliberations. However, the trial court noted that the reimbursement provisions remained in effect. *See* Section II, *supra.*

112 Ariz. 385, 542 P.2d 810 (1975). We find no abuse of discretion.

### Jury Instructions

Safeco's next argument centers on the jury instructions from which the jury concluded that the amount expended by plaintiffs to obtain a settlement of the claims against Trus Joist was reasonable. The trial court instructed the jury that in making that determination, it was to consider "all of the potential damages" of the falldown, "including the claims for ... any loss of ... profits claimed by Chapman." [13] Safeco argues that Chapman could not have recovered any lost profits in a suit against Trus Joist because, at the time of the settlement, there was no past history of profits at Chapman's new showroom from which to calculate those losses. Accordingly, Safeco contends that the jury should not have been allowed to consider that claim in determining whether the cost of the settlement was reasonable.

■ We find this argument unpersuasive. First, there is no rule of law that automatically precludes a claimant from recovering lost profits with respect to a new business. *See Rancho Pescado, Inc. v. Northwestern Mut. Life Ins. Co.*, 140 Ariz. 174, 680 P.2d 1235 (App.1984). Second, Chapman was not starting a new business but was only moving to a new and larger facility. Finally, it would have been clear to all that any question regarding the speculative nature of Chapman's claim for lost profits could well have vanished within a short time of the new showroom's opening.

### Prejudgment Interest

As part of its judgment, the trial court ordered Safeco to pay prejudgment interest commencing December 3, 1976—the date Safeco offered Trus Joist $195,000 to reimburse it for the monies expended by Trus Joist in settling with the third-party claimants. Safeco contends that the award of prejudgment interest was improper because the damages were unliquidated.

■ Prejudgment interest on a liquidated claim is a matter of right and not a matter of discretion. *L.M. White Contracting Co. v. St. Joseph Structural Steel Co.*, 15 Ariz.App. 260, 488 P.2d 196 (1971). Safeco agrees with this rule and acknowledges that a claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness without reliance upon opinion or discretion. *Costanzo v. Stewart Title & Trust of Phx.*, 23 Ariz.App. 313, 533 P.2d 73 (1975). Safeco argues, however, that because there was conflicting evidence as to the amount owed under the insurance contract, the amount of the claim could not be determined without reliance on opinion or discretion and the claim was therefore unliquidated. We disagree.

■ A claim is not considered unliquidated merely because the jury must find certain facts in favor of the plaintiff in order to determine the amount of damages. All that is necessary is that the evidence furnish data which, *if believed*, makes it possible to compute the amount with exactness. *Homes & Sons Const. Co., Inc. v. Bolo Corp.*, 22 Ariz.App. 303, 526 P.2d 1258 (1974). In the instant case, plaintiffs produced evidence indicating that the reasonable amount to have been paid to settle the claims of the third-party claimants *exceeded* Safeco's policy limits of $250,000.

In *Homes & Sons*, we held that mere differences of opinion as to the amount due under a contract does not preclude an award of prejudgment interest. We stated that all a plaintiff needed to do was "to supply to the debtor sufficient information and supporting data so as to enable the debtor to ascertain the amount owed" and that "[h]aving once supplied such information, the creditor is entitled to such interest on the amount of money the debtor retains which he ought to pay." *Id.* at 306, 526 P.2d at 1261. *See also Tri-State Ins. Co. v. Maxwell*, 104 Ariz. 574, 457 P.2d 251

---

**13.** In fact, the settlement did not include any amount for "lost profits." This potential claim, which exceeded $140,000, was a subject of discussion during Trus Joist's settlement negotiations with the third-party claimants. It clearly played a part in Trus Joist's decision not to contest such damage items as the disputed tile floor.

(1969) (award of prejudgment interest upheld even though there was a dispute as to the value of the property defendant had wrongfully obtained from plaintiff).

■ We find that the trial court properly awarded prejudgment interest in this case. We further find that the trial court did not abuse its discretion in commencing the prejudgment interest as of December 3, 1976. Prior to that date, the third-party claims had been settled and Safeco had received a detailed list of itemized damages resulting from the falldown which, if accurate, entitled Trus Joist to reimbursement for the full policy limits of $250,000.

### Attorney's Fees

When the trial court entered judgment on the verdict for bad faith and breach of contract, it awarded plaintiffs their attorney's fees in the sum of $103,499.00. When the trial court thereafter granted a new trial on the bad faith claim, but entered judgment against Safeco for breach of contract, the entire amount of attorney's fees previously awarded was carried forward and made a part of this judgment. The issue of apportionment of fees between the successful claim for breach of contract and the unsuccessful bad faith claim was not addressed.

Citing *Circle K Corp. v. Rosenthal*, 118 Ariz. 63, 574 P.2d 856 (App.1977), Safeco contends that a party which is entitled to an award of attorney's fees with respect to one claim cannot recover those fees if that claim is intertwined with another claim for which attorney's fees are unavailable unless it shows what portion of the fees corresponds to each claim. Safeco contends, therefore, that plaintiffs should not have been awarded any amount for attorney's fees or, in the alternative, that the fees should have been apportioned between the successful and unsuccessful claims. Plaintiffs respond by arguing that *all* of the evidence adduced at trial was equally relevant to both the breach of contract and bad faith claims and there would thus be no need for an apportionment.

■ We first find that *Circle K* did not establish a rule that attorney's fees may *never* be awarded if the claim for which attorney's fees is awarded is intertwined with one for which such fees are not awardable. *See Sparks v. Republic National Life Ins. Co.*, 132 Ariz. 529, 647 P.2d 1127 (1982). Instead, *Circle K* was a case in which Division 2 of this court simply decided to exercise its discretion to decline appellant's request for attorney's fees on appeal pursuant to A.R.S. § 12–341.01.[14]

With regard to the need for apportionment of plaintiffs' attorney's fees, we note that the instant case does not present a situation where there is but one claim for relief involving alternative remedies. Rather it is clear that plaintiffs have presented two separate and distinct claims—a successful "breach of contract" action on the one hand, and an unsuccessful "bad faith" action on the other hand. Under such circumstances, we have held that attorney's fees should not be awarded for the unsuccessful claim. *Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 673 P.2d 927 (App.1983).

■ In this case, however, an apportionment of attorney's fees was neither attempted nor made. In short, the trial court did not exercise its discretion to determine to what extent plaintiffs' attorney's fees should be apportioned. It is thus necessary that this matter be remanded to the trial court for a proper determination of that issue.

### ATTORNEY'S FEES ON APPEAL

Plaintiffs have requested an award of attorney's fees on appeal and the request is granted. However, pursuant to *China Doll* they are not entitled to attorney's fees incurred in their presentation of the unsuccessful cross-appeal. Accordingly, plaintiffs shall submit a statement of the amount claimed, delineating only those services rendered in defending against the primary appeal, pursuant to Rule 21(c), Arizona Rules of Civil Appellate Procedure.

---

14. Under this statute, the granting of attorney's fees to the prevailing party in an action arising out of a contract is permissive. *See Title Ins. Co. of Minn. v. Acumen Trading Co.*, 121 Ariz. 525, 591 P.2d 1302 (1979).

## CONCLUSION

The award of attorney's fees is vacated and that matter is remanded to the trial court for further proceedings consistent with this opinion. The judgments and orders of the trial court are otherwise affirmed.

GRANT, P.J., and FROEB, C.J., concur.